IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Access Ability, Inc.,             :
                    Petitioner     :
                                :    No. 2136 C.D. 2014
         v.                   :
                                  :    Submitted: July 17, 2015
Unemployment Compensation      :
Board of Review,                  :
                     Respondent   :

BEFORE:    HONORABLE BERNARD L. McGINLEY, Judge
                  HONORABLE PATRICIA A. McCULLOUGH, Judge
                  HONORABLE JAMES GARDNER COLINS, Senior Judge

***OPINION NOT REPORTED***

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                       FILED: August 18, 2015

Access Ability, Inc. (Employer) petitions for review of the October 28, 2014 order of the Unemployment Compensation Board of Review (Board), which affirmed a referee's determination that Linda S. Heberling (Claimant) had a necessitous and compelling reason to terminate her employment and, therefore, was not ineligible for benefits pursuant to section 402(b) of the Unemployment Compensation Law (Law).[1] We affirm.

Claimant worked as a full-time administrative assistant for Employer from September 14, 2009, through April 10, 2014. Claimant voluntarily resigned

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. §802(b). Section 402(b) of the Law provides that a claimant is ineligible for benefits for any week "in which [her] unemployment is due to voluntarily leaving work without cause of a necessitous and compelling nature. . . ." *Id.*

from her employment on April 10, 2014, after Ham Malek, Employer's president, threatened her with a suspension and a lawsuit. (Findings of Fact Nos. 1, 7.) The local service center granted Claimant's application for benefits, and Employer appealed. The referee convened a hearing at which Claimant, Malek, and Pam Beattie, Employer's operations manager, testified.

Claimant testified that she was not discharged but voluntarily left her employment on April 10, 2014. (Notes of Testimony (N.T.) at 5.) Claimant said that she quit because Malek created "a continuous hostile environment;" made "threats of suspension and firing on a repeated basis;" and subjected her and other staff members to "emotional abuse . . . for a very long time." (N.T. at 5.) Claimant stated that she first informed Beattie, her immediate supervisor, of Malek's activities, and later told Malek "that what he was doing was abuse," (N.T at 12); nevertheless, she said, Malek continued his objectionable conduct, and there were no other high-ranking officials to whom Claimant could have voiced her complaints. (N.T. at 13.)

Claimant explained that approximately four months after she was hired, Malek began to engage in discussions with her regarding her work performance. According to Claimant, Malek's comments consisted of "innuendos and false accusations," and when Claimant would try to explain or defend her actions, Malek would call her "names," most oftentimes a "debater." (N.T. at 5.) Claimant testified that Malek would tell her not to respond to his criticisms and would not give her the opportunity to explain or defend her conduct. In addition, Claimant stated that she and other co-workers were repeatedly suspended and threatened with being discharged. (N.T. at 6.) Claimant elaborated on one instance when Malek suspended her; she arrived at work the next day, told him that the suspension was

2

unwarranted, and Malek admitted that he had been upset with a technician the day before. (N.T. at 12.)

Claimant further testified that there was "a lot of derogatory language that was addressed to [her] and to others." (N.T. at 6.) Claimant stated that near the end of her employment, Malek started telling her that she was "lying," "cheating," and had "too big an ego." (N.T. at 6.) Claimant stated that although not directed at her, Malek used "foul language" at the office, (N.T. at 6), and introduced into evidence an email sent to her and Beattie, wherein Malek ridiculed Beattie and asked her to make some kind of response, even if it was just "a courtesy reply to say F U." (Supplemental R.R. at 6b.) Claimant testified that while there were constant threats of suspension and "[a]buse was always present in the office," it escalated six months before she left. (N.T. at 12.) Claimant testified that she told Malek that if he suspended her again, she would quit and not come back. (N.T. at 11.)

Claimant said that on April 10, 2014, she received a phone call from Employer's salesman, who is a contractor and not part of Employer's immediate staff. Claimant stated that she and the salesman engaged in a private conversation, which she characterized as "niceties between him and me," and then transferred the call to Beattie. (N.T. at 11.) Claimant testified that when the call ended, Malek called her back to the office and asked her what the salesman said; in response, Claimant stated that the salesman said he wanted to talk to Beattie. Claimant testified that Malek then wanted to know what else the salesman said, and Claimant told Malek that she would not disclose the private conversation between them. According to Claimant, Malek immediately became upset, told her that he would suspend her, informed her that he could fire her, and said that he could commence a lawsuit

3

against her. Claimant stated that at this point, she told Malek that she quit, walked out of the office, and handed in her resignation the next day. (N.T. at 10-12, 14.)[2]

Beattie testified that she was present at the April 10, 2014 meeting. According to Beattie, Malek told Claimant that he has a right to know what is being said in the office; Claimant refused to disclose the requested information; and Malek never specifically said that Claimant was suspended. On cross-examination, Beattie agreed that Employer's policies do not "spell out" the infractions that Employer cited Claimant for, nor do they list when or under what circumstances an employee could be suspended. Beattie also stated that she has heard Malek swear in the workplace, and that during a meeting he accused members of the staff as being "liars" and "cheaters." (N.T. at 20-21, 23-25.)

Malek testified that he is Employer's president and that at the April 10, 2014 meeting, he asked Claimant if the salesperson needed business forms and inquired as to whether the salesperson had been disrespectful to Claimant. Malek stated that Claimant would not answer his questions; he then told Claimant that, as the employer, he has the right to know the content of business conversations between two co-workers; and he warned Claimant that her failure to disclose the conversation would result in disciplinary action. Malek said that Claimant left during their discussion and that he never told Claimant that she was actually suspended or terminated. (N.T. at 26, 29-31.)

---

[2] On cross-examination, Claimant stated that she had made mistakes at work; admitted that she received suspension letters from Employer; and acknowledged that in a letter dated June 25, 2012, Employer said that she would be fired if she continued to do certain activities and/or commit specified errors. (N.T. at 14-17.)

4

Malek testified that he did not call Claimant "names" and did not use vulgar or profane language in her presence. He said that he described a co-worker as a liar and cheater at a meeting that Claimant attended because the co-worker took the company car after work hours, got into a wreck, and falsified his work records. Malek also stated that Claimant got suspended twice, once when she sent an invoice to the wrong contractor and payment was delayed, and on another occasion when she failed to place stamps on outgoing mail. According to Malek, the suspensions were for a half day or a few days, without pay, adding that it is an employer's right to remedy an infraction. When asked why he continued to employ Claimant despite those previous incidents, Malek testified that she was referred to him by a fellow co-member of the church and he was aware that she was going through a difficult time following a divorce. Malek stated that early on he learned that Claimant could not perform the job tasks that she said she could do at the interview, and he accommodated Claimant by reducing her job responsibilities in order for her to maintain her employment. (N.T. at 31-36.)

At the conclusion of the hearing, the referee found that Malek's testimony was evasive and inconsistent with documentary evidence, accepted Claimant's testimony as being more credible than that of Employer's witnesses, and rejected the testimony of Employer's witnesses where it is inconsistent with Claimant's testimony and evidence. (Referee's decision at 2.)

Relying on Claimant's credible testimony, the referee found that Malek used abusive language toward employees and frequently threatened to suspend employees without pay; Claimant informed Beattie and Malek about the conditions that she believed made her work environment hostile; and she voluntarily left her employment after Malek threatened her with a suspension and a lawsuit. Based upon

5

these facts, the referee concluded that Claimant had a necessitous and compelling reason to voluntarily leave her employment and was eligible for benefits. (Findings of Fact Nos. 1-7; Referee's decision at 2.)

Employer appealed to the Board. By decision dated October 28, 2014, the Board affirmed the referee's decision, adopting and incorporating the referee's findings and conclusions.

On appeal to this Court,[3] Employer argues that the Board's finding that Malek engaged in abusive conduct is not supported by substantial evidence. Employer alternatively contends that the Board's factual findings are inadequate to support its legal conclusion that Claimant voluntarily left her employment for a necessitous and compelling reason.

Initially, we note that in unemployment compensation proceedings, the Board is the ultimate fact-finder, empowered to determine the credibility of the witnesses and to resolve conflicts in the evidence. *Curran v. Unemployment Compensation Board of Review*, 752 A.2d 938, 940 (Pa. Cmwlth. 2000). The Board's findings are binding and conclusive on appeal if the record, when examined as a whole, contains substantial evidence to support those findings. *Mathis v. Unemployment Compensation Board of Review*, 64 A.3d 293, 299 (Pa. Cmwlth. 2013). In determining whether substantial evidence exists, we view the record in the light most favorable to the party that prevailed before the Board and give that party the benefit of all reasonable inferences that can be drawn from the evidence. *Big Mountain Imaging v. Unemployment Compensation Board of Review*, 48 A.3d 492,

---

[3] Our scope of review is limited to determining whether constitutional rights have been violated, whether errors of law were committed, or whether findings of fact are supported by substantial evidence. *Shrum v. Unemployment Compensation Board of Review*, 690 A.2d 796, 799 n.3 (Pa. Cmwlth. 1997).

494-95 (Pa. Cmwlth. 2012). Substantial evidence is defined as such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. *Guthrie v. Unemployment Compensation Board of Review*, 738 A.2d 518, 521 (Pa. Cmwlth. 1999).

Pursuant to section 402(b) of the Law, an employee is ineligible for benefits if she voluntarily terminates her employment without cause of a necessitous and compelling nature. 43 P.S. §802(b). Thus, a claimant seeking benefits after voluntarily quitting her job has the burden to demonstrate real and substantial pressure to terminate employment that would compel a reasonable person under similar circumstances to act in the same manner. *Dopson v. Unemployment Compensation Board of Review*, 983 A.2d 1282, 1284 (Pa. Cmwlth. 2009). The claimant must further demonstrate that she acted with ordinary common sense and made a reasonable effort to preserve her employment. *First Federal Savings Bank v. Unemployment Compensation Board of Review*, 957 A.2d 811, 816 (Pa. Cmwlth. 2008). More specifically, the claimant "must take common sense action to obviate the problem so that . . . she does not have to terminate employment, and this is accomplished by informing one's superiors of the harassing, humiliating or abusive conduct." *Porco v. Unemployment Compensation Board of Review*, 828 A.2d 426, 428 (Pa. Cmwlth. 2003).[4] Whether an employee has a necessitous and compelling reason to voluntarily quit employment is a question of law fully reviewable by this Court. *Willet v. Unemployment Compensation Board of Review*, 429 A.2d 1282, 1284 (Pa. Cmwlth. 1981).

---

[4] Here, Employer does not contend that Claimant failed to make a reasonable effort to preserve her employment or that she did not act with common sense in informing Beattie and Malek about the work-place conduct that she found to be objectionable.

This Court has held that mere resentment of a reprimand, disappointment with wages, and personality conflicts do not constitute a necessitous and compelling cause to voluntarily quit. *Lynn v. Unemployment Compensation Board of Review*, 427 A.2d 736, 737 (Pa. Cmwlth. 1981); *accord Ann Kearney Astolfi, DMD, P.C. v. Unemployment Compensation Board of Review*, 995 A.2d 1286, 1290 (Pa. Cmwlth. 2010) ("*Astolfi*"). However, it is well established that "a claimant need not indefinitely subject herself to unjust accusations and abusive conduct." *Berardi v. Unemployment Compensation Board of Review*, 458 A.2d 668, 670 (Pa. Cmwlth. 1983). Accordingly, this Court has also held that a claimant may demonstrate a necessitous and compelling cause to quit when the claimant is continuously subject to unjust accusations or abusive conduct, *Whisner v. Unemployment Compensation Board of Review*, 446 A.2d 336, 338 (Pa. Cmwlth. 1982), or where the relationship with a supervisor or co-worker has deteriorated to the point where working conditions are intolerable. *Karloff v. Unemployment Compensation Board of Review*, 531 A.2d 582, 854 (Pa. Cmwlth. 1987).

In *First Federal*, the claimant worked as a vice president who chaired committee meetings. During the meetings, a senior vice president was generally "disruptive, defiant, argumentative and also engaged in outbursts." 957 A.2d at 814. The senior vice president was "disrespectful toward [the claimant] in that in front of other employees he told her that she did not know what she was doing and that she shrugged responsibilities." *Id.* After the claimant discussed these problems with senior management, she eventually had a meeting with the employer's president. At this meeting, the president "attacked [the claimant's] leadership skills and competency, and referred to the [claimant's previous] management team . . . as criminals." *Id.* The president also "subjected [the claimant] to discipline but refused

to permit [the claimant] to respond, kept yelling at [the claimant], and told [the claimant] to leave his office." *Id.* Thereafter, the claimant voluntarily quit.

Crediting the above facts, the Board in *First Federal* determined that the president unjustly reprimanded the claimant with abusive language; the claimant was unable to respond to the discipline imposed by the president; and the senior vice president subjected the claimant to unwarranted criticism and ridicule. The Board concluded that the claimant had voluntarily quit her employment for cause of a necessitous and compelling nature. *Id.*

On further appeal, this Court affirmed, stating:

> [The claimant] demonstrated more than a mere belief of unjust accusation, as the Board concluded that [the claimant] was, in fact, unjustly reprimanded with abusive language and that [the claimant] was subjected to intolerable working conditions. Board's Opinion, at 3. The Board further determined that [the claimant] "could not respond to discipline and was subject to criticism and ridicule from a senior vice president that was uncalled for and incorrect." *Id.* We agree with the Board's conclusion that such circumstances existed which produced real and substantial pressure for [the claimant] to terminate her employment and that a reasonable person in the same circumstances would have acted similarly.

*First Federal,* 957 A.2d at 817.

Here, the Board, as fact-finder, credited Claimant's version of the events, not Malek's version, and it is Claimant's testimony on which we must focus. Viewing the evidence in the light most favorable to Claimant, her testimony established that Malek continuously and increasingly subjected her to abusive language, most notably by calling her, among other names, a liar and a cheater. Claimant's testimony also demonstrates that when assessing her work performance, Malek made false accusations and imposed unwarranted disciplinary action; Malek

9

would not allow Claimant to respond to his criticism, and he would denounce Claimant when she tried to explain or defend her actions. Further, Claimant's testimony proved that she operated under the constant and unnecessary threat of suspension, and, on April 14, 2014, was threatened with a suspension, termination, and a lawsuit for failing to obey Malek's unreasonable directive that she disclose the content of personal communications unrelated to work.[5]

Given this record, we conclude that Claimant's testimony constituted substantial evidence that supports the Board's finding that Malek engaged in abusive conduct. As in *First Federal*, Claimant was unjustly reprimanded, disciplined, and threatened, had no opportunity to respond to comments/criticism, and endured verbal ridicule on a continuous basis. This collective pattern of activity is substantially similar to the facts in *First Federal*. Accordingly, we conclude that *First Federal* controls our disposition of this case.

Employer argues that our decision in *Astolfi* compels a contrary result; however, we find that case to be readily distinguishable. In *Astolfi*, the claimant quit her job as a receptionist and surgical assistant for the dentist/employer, alleging that she had been subjected to verbal abuse by the dentist. The claimant testified that she worked in a chaotic environment, complained to the dentist about a conflict between two other employees, and the dentist told her to stop acting like "one of her children" and to "deal with it." 995 A.2d at 1287. The claimant further testified that on one occasion, the dentist told her to "shape up" or she would be terminated and, when she began to cry, the dentist stated that it was a sign of immaturity. Finally, the claimant

---

[5] *See Ellis (Etter) v. Unemployment Compensation Board of Review*, 449 A.2d 881, 882 (Pa. Cmwlth. 1982) (stating that a claimant will not be ineligible for benefits where she declines to obey an employer's unreasonable directive).

10

testified that the dentist yelled at her for speaking too long to a patient and told her that she talks "way too much." *Id.* On these facts, the Board concluded that the claimant established a necessitous and compelling reason to quit.

On appeal, this Court reversed, concluding that the claimant's testimony was legally insufficient to demonstrate a necessitous and compelling cause. We reasoned:

> In short, [the claimant's] testimony demonstrated "resentment" and "personality conflicts," *Lynn*, 427 A.2d at 737, but not an intolerable work environment. Being "yelled" at for talking too much to patients, which is the worst [the claimant] suffered, is not comparable to being called names or being unjustly accused of criminal conduct. Her work environment was uncomfortable, but not intolerable.

*Astolfi*, 995 A.2d at 1290. In reaching our decision in *Astolfi*, this Court distinguished *First Federal* on the basis that the claimant in *Astolfi* "was not publicly reprimanded or accused of being a criminal like her counterpart in *First Federal*." *Astolfi*, 995 A.2d at 1289.

Here, in contrast to the facts in *Astolfi*, Claimant was accused of being a liar and a cheater in connection with her work and was publically reprimanded with unwarranted threats of suspension. Accordingly, we conclude that the instant case is much more akin to *First Federal* than it is to *Astolfi* and that Employer's reliance on *Astofi* is misplaced.

Next, Employer argues that this case should be remanded to the Board because it failed to determine whether Claimant was suspended or discharged for willful misconduct. However, a willful misconduct analysis is only warranted where a claimant is suspended or discharged/terminated from employment. *See Middletown*

11

*Township v. Unemployment Compensation Board of Review*, 40 A.3d 217, 224-25 (Pa. Cmwlth. 2012). Here, the Board specifically found that Claimant voluntarily quit, (Finding of Fact No. 7), and because this finding is supported by substantial evidence, (N.T. at 5, 11-12, 14), the Board did not err in analyzing this matter as a voluntary quit case rather than as a willful misconduct case.

Upon our review, we conclude that the Board's findings are supported by substantial evidence and that the Board did not commit legal error. Accordingly, we affirm.

_____
PATRICIA A. McCULLOUGH, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Access Ability, Inc., : 
        Petitioner : 
         :   No. 2136 C.D. 2014
        v. : 
         : 
Unemployment Compensation : 
Board of Review, : 
        Respondent : 

## *ORDER*

AND NOW, this 18th day of August, 2015, the October 28, 2014 order of the Unemployment Compensation Board of Review is affirmed.

_____
PATRICIA A. McCULLOUGH, Judge